case this morning is Hadsall versus Sunbelt Rentals and Ms. Hill, you can start. Yes. Yes, sir. May it please the court and counsel. I am Patricia Hill and I represent Sunbelt Rentals, the respondent and appellant. On August 7th of 2020, the District Court for the Eastern District of Wisconsin granted petitioners request for an injunction. Sunbelt is here based on the appeal of that injunction. As the court will remember, this appeal involves arguments that the District Court's findings were based on erroneous findings of fact and faulty legal premises. As background for the court, Sunbelt operates a construction equipment rental business with locations called profit centers across the country and it has a profit center for its general tool division in Franksville, Wisconsin. It's two biggest people. How many employees were there at Frankville total? Okay, including the non-bargaining unit employees? Yeah, everybody. Yeah. Okay, that would have been at should be about 10 to 12. Okay. All right. Thank you. It's two biggest competitors are United Rentals and Ahern Rentals. On March 13th, 2018, Operating Engineers Local 139 was recognized as the bargaining representative for Sunbelt's eight employees at the Franksville Profit Center. The positions were shop and road mechanics, drivers and foreman. Sunbelt's bargaining team included the Regional Vice President Jason Mayfield, the District Manager Robert Bogardus, Profit Center Manager Brian Anderson, and me. Mr. Mayfield's region covered half of Ohio, all of Michigan, Illinois, Wisconsin, Missouri, Iowa, Nebraska, and Minnesota. His office was in Sugar Grove, Illinois, approximately a two and a half to three hour drive to Franksville. Mr. Bogardus' district was Wisconsin until July 2019 when he transferred to a different division. Mr. Anderson was the manager of the Franksville Profit Center from May of 2018 to July 19th, 2019 when he transferred to the Fond du Lac location. Franksville still does not have a Profit Center Manager. Mr. Mayfield was the Chief Negotiator. He made the final determination as to what each of the proposals would be. What happened to those eight employees who participated in the election and were the highest paid Sunbelt employees in Wisconsin? A driver was terminated for losing his license. Another driver posted and received a promotion to outside of the unit. A mechanic posted for and received a transfer to another division. A driver had a work-related injury prior to the election and ultimately decided he could not return to work. Another mechanic, Ramon Gutierrez, violated a safety rule and was terminated. An employee at another Profit Center who was terminated for violating a safety rule went to work for a customer, saw Mr. Gutierrez doing the same thing that he was terminated for, and reported him to Sunbelt. Gutierrez filed an unfair labor practice charge that was denied, it was appealed, and the appeal was denied. Another driver, the union steward, Jamie Smith, violated a safety rule and was terminated. He filed an unfair labor practice charge that was denied. That resulted in a road mechanic and a shop mechanic being employed by the middle of July of 2019. Contrary to petitioner's brief, Sunbelt does not employ maintenance employees at the Franksville Profit Center. Therefore, the record is clear that six of the eight employees took it upon themselves to impact their employment status. The remaining two employees who were laid off were eligible for rehire, and that is important because their paperwork stated it, and Mr. Anderson told them they were eligible for rehire and encouraged them to apply for any open position that they were qualified for. Only one of the two mechanics testified at the hearing. The petitioner and the district court failed to address how listing those two laid off employees is eligible for rehire demonstrated anti-union animus by Sunbelt. Now, Franksville's business back in 2018-2019 came from its outside sales representatives who called on construction sites and companies to generate business. Now, because the Franksville location is right off of I-94, it generated more walk-in business than any other profit center in Wisconsin. In fact, the former profit center manager, Ms. Torgerson, testified that in her first year as profit center manager at Franksville, and when that location first opened, that the operations manager, Dan Atwell, based on the high percentage walk-in customers, recommended having a drive-through section of the mechanics workshop and transferring out all the big equipment, meaning like the 60-foot booms, the variable forklifts, equipment like that. Robert Rivera, the Waukesha general tool manager, testified that Franksville had 60-70 percent of its business from walk-in business, while his Waukesha location had 20-25 percent walk-in business. Mr. Anderson testified that the Fond du Lac location that he transferred to in July probably had a tenth of the walk-in business that Franksville had. Now, those walk-in customers rent the smaller equipment. As explained at the hearing, the larger pieces of equipment generate larger revenue dollars than the smaller pieces of equipment, but there is a greater return on the cost of the smaller machine. There's undisputed evidence that a piece of equipment that cost $10,000, and that would be a Waukesha location, would generate 100 percent to 200 percent return in the first year of its life. A $200,000 piece of equipment would only generate $30,000 in the first year of its life. It was the larger equipment that was rented at the job sites, and that equipment was kicked off by the union's bannering and inflatables. The report from Dan Atwell demonstrated that at suppressing some of the profitability of that Franksville location. To ensure that Franksville did not need to be closed based on the larger equipment being kicked off of the job sites, Mr. Mayfield reorganized Franksville to a profit center for the small pieces of equipment and the walk-in business. Yes, Sunbelt and the union had 13 negotiation sessions, but the parties made huge progress towards a contract. The union's chief negotiator acknowledged that more than 20 tentatively agreed to provisions, and that's without the subparts to them, were very important. Yes, Mr. Bogardus was not shy about his anti-union animus, but Mr. Mayfield showed absolutely no anti-union animus. The administrative law judge's decision that the admittedly relied upon for its decision relied upon Mr. Bogardus's anti-union animus. However, contrary to the order, the record is very clear that Mr. Bogardus never told the bargaining unit employees five times that he would close the store if the union won the election. And Mr. Bogardus's comments to Ms. Torgerson that the union, about the union, were to her alone, and he also included issues with the inventory shortage. She admitted at the hearing she had three consecutive audits with inventory shortages, and the last one before a termination there's a shortage of $16,000. Additionally, Mr. Bogardus was not the decision maker for any of the negotiations or the decision to reorganize the Franksville Profit Center. Ms. Hill, let me ask you a question. My sense is the reason that you're outlining the commercial background of the Franksville Profit Center is because you're not looking at the actual needs and disconnected from any anti-union animus that way. That is correct, sir. It also shows that it wasn't something that this walk-in business, reorganizing it, was not something that just came completely out of the air on or around August 5th of 2019. Okay, but isn't it also, why was the district court wrong to take stock of the negative impact that the union activity was happening as a result of placing the inflatables at job sites, the bannering, and what have you? That couldn't possibly have been welcomed by Sunbelt, and isn't it a fair inference on the district court's part that Mr. Mayfield was certainly aware of that? He wouldn't have been oblivious to it, correct? He was not oblivious to it, Your Honor, but there have been lots of different issues that he was aware of. No, my point is that if it's a fair inference, as you're acknowledging, that he is aware of the union activity or what he may have considered union agitation at the customer sites, and he reorganized in a way that just entirely got out of that line of scrutiny. So, I'm not sure that the district court's entry of injunctive relief here. Because, Your Honor, that had been ongoing for quite some time, and it had supposedly started in February. I guess you might say it really started to be something that was on the front page of the newspapers and everything else in about March. It was the monetary impact that's what resulted in... Well, sure, that's your view. That's huge. Well, that's your view of it, right? But what you have to demonstrate is that the district court was entirely wrong to view the union activity or what may have been thought of as union agitation as a reason just to get out of that line of business and go to all walk-in business at Franksville. Right, but the district court only mentioned Mr. Mayfield, I believe it was five times, didn't discuss his animus at all, didn't even look and analyze that aspect of their decision, Your Honor, with due respect. It was Mr. Bogardus that the Ministry of Law Judge's decision and the district court's order concentrated... Yeah, but I don't know how you can maintain or even suggest that Mayfield had no idea about the union's bannering or the blow-ups or whatever they're called, the inflatables and all that. He certainly knew about it. He knew about it, but did the administrative law judge or did the he made the decision? It is pure money, the result of them kicking the big equipment off of the job sites. The small equipment, there's very little small equipment on the job site. It's a big equipment and that's why he was faced with, do you want to close this completely or do you want to at least have it survive, see what we can do and move on from there? All right. And I also, on behalf of Sunbelt, respectfully suggest that there were errors with the alleged interviews, I guess you would say, or interrogation of the employees. They talk about Mr. Anderson's alleged statements to Mr. Gutierrez, but Mr. Gutierrez laughed them off. He didn't think that there was anything that was intimidating about it, but it almost appears from the decision from the administrative law judge and also from the district court judge that they were trying to do sort of a novel reverse cat's paw theory that Mr. Mayfield should be identified as having anti-union animus because of Mr. Bogardus's actions or Mr. Pender, who had nothing to do with negotiations or the reorganization. So with respect to that, we believe that there is nothing to support that it was because, as you pointed out, Judge Scudder, that it was because of the bannering and inflatables. It was the monetary result of what was going on. How do you respond to that as best you can? And those two employees were eligible for rehire. And if you look at the numbers, and by the way, there was one other thing that was I think not quite stated properly in the order, and that was that Sunbelt refused, allegedly refused to respond to the request for the tentative agreements to be agreed to in a different format. Sunbelt produced to the union in January, and that was the 6G, excuse me, the 7G exhibit. They produced that to the union. Then approximately one month later with less, well, approximately 24 hours notice, the union wanted an updated one. It couldn't be produced in that short a period of time. It was produced later. If you look at the difference between General Counsel Exhibit 6G and General Counsel Exhibit 7G, you'll see a huge difference. And at the negotiations in June, Sunbelt asked to have the union's version that was set up very quickly. They had to have that in a word version so they could do a very quick red line comparison. Now, also with respect to the allegation that the 139 is a fledgling union, that is not supported by the testimony. You'll hear that, you'll read in the testimony, that they had thousands of members. They had the support of the local 150 out of Chicago throughout. And Mr. Irvin has and continues to work closely with the 150, and the 150 had its Sunbelt employees not even working for Sunbelt for approximately two weeks at one point. Now, therefore, I'm going to reserve the rest of my time for rebuttal. And thank you. Thank you, Minister. Mr. Wallace. Thank you, Your Honor. Good morning, Your Honors. May it please the court, Chad Wallace for the Labor Relations Board. Ms. Hill just spent a great deal of time going through a lot of facts, credibility determinations, merit issues. But that's not why we're here. Those are for the board and for the administrative law judge. We're here in this forum to ensure that Sunbelt does not profit from its illegal conduct, prevent employees' rights from being eviscerated, preserve the board's remedial power, and effectuate Congress's statutory intent. The district court correctly recognized the potential for irreparable harm that flows from the types of unlawful acts that Sunbelt committed. The court was well within its discretion to issue an injunction, prevent irreparable harm, and preserve the board's remedial authority. The record shows that Sunbelt harbored deep anti-union animus from the moment employees showed interest in organizing. That animus then pervaded every aspect of Sunbelt's dealings with the union and the employees who support it. From the start, Sunbelt told employees that if they chose the union, Sunbelt would close the store and terminate employees. When the union won, despite Sunbelt's threats, Sunbelt then refused to bargain in good faith. And then when dragging out bargaining failed to remove the union, Sunbelt decided to terminate the entire bargaining unit, eviscerating any potential for the union to regain its footing with Sunbelt. Mr. Wallace, as you're making your points here, you're using Sunbelt in a broad way. One of the things that my sense is running through Ms. Hill's mind, saying who do you have in mind at Sunbelt? Because Mr. Mayfield is the one that made the reorganization decision, as you heard her emphasize this morning. And so can you focus on Mr. Mayfield in particular or tell us why that the focus on him is not the proper focus and what the evidence showed with respect to whether he harbored any anti-union animus? Certainly. Your Honor, I'm going to answer that broadly, just in context of right line, and then focus specifically on Mr. Mayfield. So as initial matter, the district court correctly applied the board's right line analysis and gave appropriate deference to the administrative law judge's findings and evidence. Respectfully remind the court that because the district court did not conduct its own evidentiary hearing and relied exclusively on the administrative record, it appropriately gave considerable deference to the administrative law judge's factual and credibility finding. And also given the board's expertise in this matter, the district court was appropriately hospitable to the views of the director. Here we have multiple statements and actions by supervisors and managers. This includes Anderson, Bogardas, and Mayfield. Those people, or specifically, pardon me, let me back up. Anderson and Bogardas, they then met with their manager, which was Mayfield, to discuss their statements and their plans to surveil and oust the union. The critical piece here, Your Honor, is no supervisor or manager at any level in this case is an island. There is evidence that links them all together. Bogardas regularly met with Mr. Mayfield to discuss his plans to terminate bargaining unit employees. Indeed, Mr. Bogardas directly testified to this fact, and that is in the board supplemental appendix, the transcript in our supplemental appendix at pages 40 to 41. Mr. Bogardas expressly says, I met with Mr. Mayfield about terminating the union. Mr. Mayfield was also the bargaining decision maker who presided over a year of bad faith bargaining. Mr. Anderson surveilled employees' union activities, claiming he was, quote, fishing for more information, and then he reported those findings in an email directly to Mr. Mayfield with copies to Ms. Hill and Mr. Bogardas, and we also produced that email, and that's in our supplemental appendix at page 91. There's no way to plausibly suggest that any of those activities occurred without Mr. Mayfield's involvement and or knowledge as the highest ranking manager for the facility. Critically, Judge Scudder, I think this will really go to your point. All these managers are agents of Sunbelt, and there is no evidence anywhere in the record that Mr. Mayfield or any other senior manager disavowed the statements or actions of their all-knowledge actions and ultimately liability to Sunbelt. This then provides more than sufficient evidence of a causal connection, which is what we're looking for in the right-line analysis, a causal connection for Sunbelt's decision to terminate the entire bargaining unit. Regardless of how it was finally effectuated, agents of Sunbelt, namely Bogardas and Mayfield, discussed ways to terminate bargaining unit employees in some form, either by shutting down the entire store or just eliminating the bargaining unit, and then they did exactly that in August of 2019. Specifically... So that's kind of an imputation argument, right, by its terms. What about the point that the reorganization of Franksville to primarily a walk-in business was made by Mr. Mayfield, and that was driven by just the economics of the circumstances? That, Your Honor, we believe was, on the one hand, at worst, pretext at best an insufficient business justification. Again, they did exactly what they promised to do, which was terminate the bargaining unit. Mr. Mayfield admits there's no documentation of his decision to reorganize the location. It's not something that he typically does. Again, his direct testimony was, I don't typically handle these. These I leave to my managers. I don't typically work with layoff situations. I leave those to my subordinates. He's not typically the one who, in the first instance, makes these kind of decisions. He expressly that occurs at the local level. The critical point in that, in terms of the alleged economics of it, is that they were making more money than the previous year that summer in 2019. And then when they effectuated their alleged reorganization, first, they continued to do the same work that they had done before, simply with not bargaining employees, and did that until as late as December 2019, when the administrative law judge's hearing was going on. Second, their revenue precipitously dropped the following month, showing that the reason for the change was likely not the reason given, because the change was, we're allegedly losing money, so now we have to get rid of it, and there's all this walk-in business. But then they lose even more to a negative actual revenue stream post-organization. These types of violations, this terminating of the entire bargaining unit, these bad-faith bargaining threats of futility, these violations are precisely the type of hallmark violations that Section 10J is designed to address, because they predictably chill union supports. It's critical that a final board order is not going to be able to effectively remedy what happened here. A final board order is likely to contain at least a bargaining order and reinstatement of the unit, likely among other things. But by that time, years away, there'll be no employee support, and the remaining employees will have seen what Sunbelt does to those who support the union. The union won't be able to bargain without employee support, because that support is without it. Why the long reason for the delay before a board adjudication? Sorry, I apologize, Your Honor, I didn't quite, could you repeat the question? Why the long delay before a board adjudication of this matter? Certainly, Your Honor. Unfortunately, it's just that typically the slow pace of the board's adjudicatory proceedings, by the time there's an initial investigation, and then a complaint is issued, and then the administrative law judge, the case is presently pending before the board, and under the board's rules and procedures, cases where a Section 10J injunction has issued do get expedited. Unfortunately, there are a large number of cases presently before the board, and so I don't have a great answer for you. What is the average time from adjudication by the ALJ to final adjudication by the board these days? It can be months to years. Sadly, there's no great metric on average, at the very least, nothing that I have in front of me, but based on my experience, it's typically months to years. It depends. Of course, these days, COVID has thrown a bit of a wrench in things, and we've been working around that. This has been going on, what, 35 years at least? Yes, but also, Your Honor, this is exactly the reason why Section 10J exists, why it was put in the statute, is because it recognized, unfortunately, this very slow pace of the board, which is why it's critical in this matter to effectuate Congress's intent in realizing that the board does take its time. And it is, of course, critical that the board takes the time to, not too long, of course, but takes enough time to come to the right decision, the correct decision in this case. And unfortunately, because of that long amount of time, and it's unknown when the board will final order, that's why it's critical that we affirm the district court's injunction. Of course, otherwise, employees will have seen that the union can't protect them and their rights, and that a board order attempting to vindicate their rights is years away. Also, this is not speculative in this case. There is affidavit evidence showing that following Sunbelt's unlawful actions, the union's efforts to organize at other locations were rendered null. Without an injunction, Sunbelt will have gotten away with its unlawful goal of destroying the union and robbing employees of their statutory rights. Board and circuit law is well settled, both as to the violations in this case and the criteria for Section 10J injunction, which the district court followed and its decision in order should be affirmed. Mr. Wallace, can you... Yes. You don't have to answer it right now, but at some point before you conclude, can you address the issue with the possible overbreadth of the injunction on the any other manner in light of the Supreme Court's holding in express publishing? Certainly, Your Honor. In this case, a broad order is necessary because Sunbelt has engaged in egregious and widespread violations of the acts. I understand that you think it's important and would advance statutory purposes here, but isn't the problem that it's basically a future mandatory injunction? It's basically saying, and this is the issue that I have, or the concern that I have with it in light of express publishing, you can't by way of a mandatory order say, do not violate any aspect of the National Labor Relations Act or here's Section 7 on a going forward basis. You might be able to tailor it more and say, you shall not engage in like conduct, but you just can't say you're not allowed to violate the statute in any way. Well, Your Honor, this circuit specifically dealt with this in its cutting decision. It initially did look at the possibility that a broad order would be permissible. It simply wasn't permissible in the cutting case because there wasn't the type of widespread and egregious violations that are occurring here. What point of law does express publishing stand for in your view? If you had to summarize the holding, how would you summarize? That's as binding as anything on us. Your Honor, that is not coming directly to mind. And if I may request that the court allow me to file a supplemental brief on that matter, so that I'm not engaging any type of speculation and misquote the case at that time, if Your Honor would allow that. Your Honor, I would like that. You may file. Thank you. Mr. Wallace. Yes, Your Honor. How is this situation, how does it involve broader violations of the act than most of the cases you see? You make that exclusory assertion in your brief too. My initial reaction was, well, gee, I've seen a lot of cases like this too. This doesn't seem to be all that atypical. Certainly, Your Honor. The most egregious violation here, and as I characterized this earlier, it really is the capital punishment of labor law, is that Sunbelt just excised the entire bargaining unit. It had promised to do that from the start, and then it made good on that promise. That type of just termination of the entire bargaining unit is the type of violation that really just stays in the memory of employees, both the employees who were terminated and the employees who saw what happened. There are other situations, there are the situations where maybe the union was more robust, which this goes to something, I want to correct something that Ms. Hill brings up often, that she claims this is not a fledgling union. However, she's mischaracterizing what's meant by a fledgling union. That is as to the employees at that shop, not the union as an entity. The union simply represents those employees. So this is absolutely a fledgling unit. It began with 10 employees, it ended with two, and then those two employees were fired. Unlike Judge Ripple, perhaps at other locations where there's multiple shops and the union's survived something like that. Here, first, this circuit's jurisprudence recognizes, in fact, it often uses words like it's common sense that these type of violations cause long term, and if not remedied by an injunction, it will become irreparable, as opposed to other places where the union would be able to withstand that type of vicious, unfair labor practice. I see my time is starting to run down. If your honors have no further question, I'll make one final closing remark. And that is that without an injunction, Sunbelt will profit from its unlawful acts and employees will be robbed of their statutory right to form and join a union, bargain collectively through their representatives of their own choosing. A final board order will simply come too late. The district court was well within its discretion to order an injunction, and this court should affirm. Thank you, your honors. Yes, sir. Thank you. First of all, let me start off by saying that contrary to what I just heard, Mr. Mayfield disavowed Mr. Bogardus' suggestion of closing the profit center after the election. That profit center continued to be open. Second, when Mr. Bogardus and Mr. Anderson were going to be moving the large equipment away from the Franksville location to other locations, Mr. Mayfield, and this was because of Mr. Atwell's plan for making that location a walk-in facility, Mr. Mayfield stopped that. Now, there was also an allegation regarding that Mr. Mayfield ordinarily did not do that type of thing of reorganizing a facility. As I stated earlier, Mr. Bogardus was gone, and they did not have a district manager there until 2020, the summer of 2020. Mr. Anderson had transferred to the Fond du Lac location. There was no one else at that location. Mr. Mayfield had to step in as a district manager and then try to have someone handle some of the profit managers' responsibilities at that location, but it fell to Mr. Mayfield, and that has been ignored. By the way, Judge Stutter, I apologize. I counted the number of employees there, and there were 14 employees at the time of the election. Contrary to what I just heard, there were only eight individuals who voted in the election at Franksville. Ms. Hill, can I get the benefit of your reaction to one question? Sure. And it's that there were, I think, 13 or so meetings, negotiating sessions over a 15-month period here, and you offer the reasons why there weren't more, et cetera, but how did you respond to the board's point that that's just simply not enough? That's not enough. That doesn't show a serious good faith commitment to working with the union that sometimes you need to work three, four days a week and have some evening negotiating sessions. It's just not intended to stretch out like this. With respect to an evening negotiation session, the union would not work past a certain time, usually about 2 o'clock in the afternoon, Your Honor. With respect to trying to have more of them, it's formulaic, some of the decisions that are out there, to be very blunt about it. Please look at the quality of the agreements that the parties reached. I mean, they were significant, and there were economic proposals that were agreed to. From the get-go, Sunbelt was prepared, sent them even before the negotiations to be able to have all the benefits and the handbook. This was a new union. They didn't even know about the benefits and the handbook. So, Your Honor, it's pure speculation that those members would not be agreeable to joining a union or any other location in Sunbelt because the union also had an adverse impact on the Wisconsin district due to the bannering and the inflatables. It is pure speculation. I apologize for going over, Your Honors. Thank you, Ms. Hill. Thanks to both counsel, and the case will be taken under advisement.